IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHELE J. TREVINO, )
)
    Plaintiff, )
) No. 14 C 2257
v. )
) Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Michele Trevino has filed a motion to reverse and remand the Commissioner's decision denying his claim for disability benefits (doc. # 16), and the Commissioner has filed a motion asking the Court to affirm (doc. # 24). For the reasons that follow, we grant Ms. Trevino's motion to remand and deny the Commissioner's motion to affirm.

### I.

Ms. Trevino filed for disability benefits on February 3, 2010, alleging she became disabled on February 2, 2010 (R. 13). A hearing was conducted before an administrative law judge ("ALJ") on July 17, 2012. On September 21, 2012, the ALJ issued a "partially favorable" decision, determining that Ms. Trevino was disabled from February 2, 2010, through October 13, 2011, but that her disability ended on October 14, 2011, when she became able to perform substantial gainful activity due to her medical improvement (R. 13-14, 23). The Appeals Council denied Ms. Trevino's request for review (R. 1).

---

[1] On April 17, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 8, 10).

## II.

In considering Ms. Trevino's case, we begin by addressing, in turn, the evidence -- and the ALJ's opinion -- covering the time periods before and after October 14, 2011.

### A.

For the period lasting from Ms. Trevino's alleged onset date until October 14, 2011, the period during which the ALJ found Ms. Trevino was under a disability, the ALJ stated that Ms. Trevino "had the following impairments, one or more of which were severe": degenerative joint disease of the right shoulder (including a partial tear of the right supraspinatus ligament -- part of the rotator cuff); status post arthroscopy;[2] degenerative disc disease of the cervical spine (neck); hepatitis C infection;[3] anemia secondary to menorrhagia;[4] history of alcohol abuse; mood disorder; anxiety; and parotitis[5] (R. 17). For this period, at Step 3, the ALJ found that Ms. Trevino was disabled because "the severity of the Claimant's combined impairments medically equaled the severity contemplated by listing 1.02" (R. 18). Listing 1.02 covers a major dysfunction of a joint resulting in "an inability to ambulate effectively" or "an inability to perform fine and gross movements effectively." 20 C.F.R. Pt. 404, Subpt. P., App. 1.02.

---

[2]Arthroscopy is a procedure for diagnosing and treating joint problems, during which a surgeon inserts a narrow tube containing a fiber-optic video camera and/or pencil-thin surgical instruments through small incisions to diagnose and/or repair joint damage. http://www.mayoclinic.org/tests-procedures/arthroscopy/basics/definition/prc-20014669.

[3]Hepatitis C is a viral disease that leads to liver inflammation. http://www.nlm.nih.gov/medlineplus/ency/article/000284.htm.

[4]Menorrhagia is the medical term for menstrual periods with abnormally heavy or prolonged bleeding. http://www.mayoclinic.org/diseases-conditions/menorrhagia/basics/definition/con-20021959. Menorrhagia can lead to iron deficiency anemia, where a woman's blood is low in hemoglobin, a substance that enables red blood cells to carry oxygen to tissues. Signs and symptoms of iron deficiency anemia include pale skin, weakness, fatigue, shortness of breath, rapid heart rate, lightheadedness and headaches. http://www.mayoclinic.org/diseases-conditions/menorrhagia/basics/complications/con-20021959.

[5]Parotitis is the inflammation of one or more of the parotid glands, the two largest salivary glands, located in each cheek over the jaw in front of the ears. http://www.nlm.nih.gov/medlineplus/ency/article/001041.htm.

The ALJ did not explain how or why the aforementioned impairments combined to meet Listing 1.02. Rather, the ALJ reviewed some medical evidence of these impairments, mostly as discussed by Sheldon Slodki, M.D., a doctor of internal medicine who testified as a medical expert at the July 17, 2012 hearing (R. 18).

*First*, the ALJ noted that Ms. Trevino tested positive for hepatitis C in August 2009 and received treatment until October 8, 2010, during which time she suffered from severe anemia, depression and fatigue (R. 18). The hepatitis C treatment involved weekly interferon shots and daily ribavirin tablets,[6] which the treating physician, Dr. Asad Aziz (whom the ALJ did not mention by name), described as "very arduous" and the side effects as "substantial" (R. 369, 374, 468). The ALJ noted that Ms. Trevino's hepatitis C resolved with treatment, and by October 4, 2011, her hemoglobin and white blood cell count were normal (R. 18).

*Second*, the ALJ noted that Ms. Trevino was in a car accident on January 3, 2011, which produced neck pain and bilateral shoulder pain, and "unmasked" a bulge in her cervical spine and a partial tear in her rotator cuff, as well as bursitis[7] and arthritis in her shoulder (R. 18). Richard Rabinowitz, M.D., of Barrington Orthopedic Specialists, first prescribed physical therapy and medication including Flexeril (a muscle relaxant), but Ms. Trevino complained of worsening neck and shoulder pain into the summer of 2011 (R. 634, 637, 640-42). The ALJ noted that in July 2011, Ms. Trevino received trigger point injections, followed by epidural and shoulder injections and a medial branch block; however, these procedures did not help her pain (R. 18). David Tashima, M.D., who performed the injections, suspected Ms. Trevino suffered

---

[6] These medications are used together to prevent hepatitis C from growing inside a person's body. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a690006.html; http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605018.html.

[7] Bursitis occurs when a bursa -- a small, fluid-filled sac that acts as a cushion between a bone and other moving parts, such as muscles or tendons -- becomes inflamed. http://www.nlm.nih.gov/medlineplus/bursitis.html.

from myofascitis (R. 643-44).[8] Ms. Trevino had additional injections in the right shoulder and neck area in August and September 2011, but they provided only partial and temporary pain relief (R. 656-57). Eventually, on October 13, 2011, Ms. Trevino had arthroscopic surgery on her shoulder (R. 18).[9]

*Third*, the ALJ stated that Ms. Trevino's parotitis impairment "was resolved" after treatment in October 2009 (R. 18).[10] The ALJ also stated that a hysterectomy on February 10, 2011, "resolv[ed] anemia issues related to heavy bleeding" (*Id.*). Nevertheless, the ALJ stated that he adopted Dr. Slodki's opinion that from February 2, 2010 to October 13, 2011, the combination of these impairments -- including fatigue from hepatitis C treatment, anemia from menorrhagia, and pain from her neck and shoulder -- equaled the severity of Listing 1.02 (*Id.*).

**B.**

However, the ALJ found that as of October 14, 2011, Ms. Trevino no longer had an impairment or combination of impairments that met or medically equaled a Listing (R. 19). The ALJ did not state whether any of the conditions he determined were severe impairments prior to October 14, 2011, remained severe after that date, and if so, which ones. We summarize below the ALJ's discussion of Ms. Trevino's mental and physical impairments as of October 14, 2011.

---

[8] This condition, which also is referred to as myofascial pain syndrome, is a chronic pain disorder in which pressure on sensitive points in muscles causes pain in seemingly unrelated parts of the body. http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195.

[9] An internal medicine consultative evaluation and physical residual functional capacity ("RFC") assessment were also completed at the request of the Department of Disability Services ("DDS") during this time period (R. 474-76, 501-03). The ALJ did not consider them in finding that Ms. Trevino was disabled through October 13, 2011, and we do not do so here.

[10] The evidence on this point is more complicated than the ALJ's conclusion suggests. Ms. Trevino had been treated unsuccessfully for parotitis with Augmentin three times in 2009 (R. 382-86), before Thomas Garrity, M.D., of Northwest ENT Associates, treated her with a 10-day dosage of dicloxacillin (antibiotic) (R. 340). While this treatment initially appeared successful (R. 340), on March 22, 2010, Ms. Trevino returned to Dr. Garrity with pain, tenderness and a suspected salivary stone in her neck (R. 344-48). Dr. Garrity diagnosed her with recurrent parotitis and prescribed additional antibiotics (*Id.*). Dr. Slodki also testified that though the parotitis was resolved with antibiotics, Ms. Trevino has had recurrent problems with it over a long period of time (R. 49).

4

**1.**

The ALJ assessed the degree of functional limitations resulting from Ms. Trevino's mental impairments, applying the so-called "paragraph B" criteria (R. 19). The ALJ stated that Ms. Trevino had only mild restriction in activities of daily living because she prepares her own meals, cleans, does laundry, drives to the store, and handles finances (*Id.*). He determined that Ms. Trevino had only mild restriction in social functioning because she maintains some contact with family and friends and related adequately to the consultative examiner and her treating physician (*Id.*). In addition, the ALJ adopted the finding of the testifying mental health medical expert at the hearing, psychologist Michael Cremerius, Ph.D., that Ms. Trevino had moderate difficulties in concentration, persistence or pace (*Id.*). The ALJ reasoned that although she is followed by a psychiatrist, Ms. Trevino had not been admitted to the hospital and had not received "intense" treatment for mental health issues (*Id.*). The ALJ determined that "[t]he severity of the Claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06" (R. 19).[11] The ALJ concluded that Dr. Cremerius's opinion was "consistent with the record," and he adopted Dr. Cremerius's opinion that despite her mood disorder, anxiety and "diagnosis of major depression disorder," Ms. Trevino was able to work, provided she was limited to simple, routine and repetitive tasks and no more than incidental contact with the public (R. 21).[12]

---

[11] Before determining whether the claimant's mental impairments meet or equal a listing, the ALJ must determine the severity of the mental impairment. If the mental impairment is severe, the ALJ determines whether the impairment meets or equals the severity of a listed mental disorder; if it does not meet a Listing, then the ALJ assesses the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520a(d)(1)-(3). Because the ALJ found that Ms. Trevino's mental impairments did not meet a Listing, and proceeded to evaluate her RFC, the ALJ must have found that Ms. Trevino's mental impairments were severe.

[12] A mental status examination and mental RFC assessment were completed at the request of DDS prior to October 2011 (R. 479-82, 488-99). The ALJ did not consider them at any point in his opinion, and we do not do so here.

In reaching this conclusion, the ALJ stated that Ms. Trevino "started services at Behavioral Health in 2010 where she saw a psychiatrist but did not have any counseling" (R. 21).[13] The ALJ further wrote that "the record reflects Claimant has symptoms of anxiety and depression," and he determined that "she last saw her psychiatrist on March 2012" due to "financial reasons" (R. 21). And, Ms. Trevino testified that she no longer takes medication for her mental health issues because her insurance ran out and she could no longer afford it (R. 66).

However, the exhibit to which the ALJ cites, Exhibit 35F, shows that Ms. Trevino received mental health services through at least July 2012 (*Id.*, citing Ex. 35F (R. 738-68)). The ALJ did not mention that in May 2012, Ms. Trevino began receiving therapy at DuPage County Psychological Services after her insurance ran out and she could no longer afford to see her previous psychiatrist (R. 726). Nor did the ALJ mention that in June and July 2012, DuPage conducted an extensive mental health assessment of Ms. Trevino. In that assessment, Ms. Trevino was diagnosed as having major depressive disorder, recurrent and severe, symptoms of tearfulness, low energy and motivation, irritability, interrupted sleep, panic disorder without agoraphobia and past alcohol abuse; she was also assessed a Global Assessment Functioning ("GAF") score of 45 (R. 728, 739-53, 755-56, 761), which is within a range (41-50) that signifies serious psychiatric illness.[14] Ms. Trevino was prescribed citalopram and Seroquel for agitated

---

[13] It is unclear how the ALJ determined that Ms. Trevino did not also receive counseling during this time. Notes from Ms. Trevino's mental health care provider during her monthly appointments at Behavioral Health Care Associates from January 2010 through October 2011 show that in addition to medication management (she was prescribed various combinations of Ativan, Celexa, Wellbutrin and Lozepram), Ms. Trevino received psychotherapy for her reported feelings of panic, depression, stress and anxiety (R. 320-21, 506-09, 697-704).

[14] We note that in 2013, after the ALJ here issued his decision, the fifth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014).

6

depression and panic (R. 763). On July 3, 2012, she went to the emergency room complaining of chest pain, anxiety and panic attacks, and she was prescribed Lorazepam (R. 724).[15]

## 2.

As to her physical impairments after October 13, 2011, the ALJ adopted Dr. Slodki's opinion that "significant medical improvement occurred" after Ms. Trevino's hysterectomy, hepatitis C treatment and her shoulder surgery, such that "her combined impairments no longer equaled the severity of listing 1.02" and she was no longer disabled (R. 20). The ALJ stated that he also considered Ms. Trevino's "musculoskeletal, digestive, shoulder, hematological and mental impairments" in the context of Listings 1.02, 1.04, 5.05, 7.02, 12.04, and 12.06, and determined that her impairments individually or in combination did not meet or equal any other Listing as of October 14, 2011 (*Id.*). The ALJ explained that Ms. Trevino's shoulder was "successfully treated with arthroscopy and debridement" on October 13, 2011, and "the remaining impairment of the degeneration of the cervical spine was noted to be a 'minimal disc bulge'" by Dr. Rabinowitz (*Id.*). The ALJ stated that Dr. Slodki's opinion was "consistent with the record," and he adopted Dr. Slodki's conclusion that as of October 14, 2011, Ms. Trevino had the residual functional capacity ("RFC") to perform a restricted range of unskilled sedentary work, limited to simple, routine and repetitive tasks and incidental contact with the public, as recommended by Dr. Cremerius (R. 20-21).

The ALJ also stated that Ms. Trevino's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the Claimant's statements

---

[15]There is no suggestion that the ALJ did not have this information in the record before him when he issued his decision in September 2012. The Appeals Council's denial of Ms. Trevino's request for review states that Ms. Trevino's attorney submitted additional records to the Appeals Council after the ALJ's decision, but those documents consisted of imaging reports and laboratory work extending into 2013, not mental health records preceding September 2012 (R. 2, citing Ex. 37F (R. 772-89)).

concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning October 14, 2011, to the extent they are inconsistent with the residual functional capacity assessment" (R. 20). In explaining that conclusion, the ALJ noted merely that a record dated January 26, 2012 (a report from Dr. Rabinowitz) stated that Ms. Trevino had generalized mild tenderness over her neck and shoulder and mildly restricted movement (R. 21). In addition, the ALJ noted that at that appointment, Ms. Trevino indicated that she had pain through the right side of her neck but she was not taking any medications for pain relief (*Id.*).

The ALJ did not mention any other treatment Ms. Trevino received for her physical impairments after October 14, 2011. This treatment included additional epidural steroid injections on December 30, 2011 (R. 713) and February 2, 2012 (R. 715) and three cervical medial branch blocks on March 30, 2012 (R. 718), none of which eased her neck and shoulder pain for more than a few days (*see* R. 710, 715, 720). As of February 2012, Ms. Trevino continued to complain to her doctors of pain, rating her neck and shoulder pain as a seven out of ten, worse with prolonged sitting and standing (R. 716). She had trouble sleeping due to the pain, and she was taking cyclobenzaprine Hcl (a muscle relaxant) and Norco (acetaminophen and hydrocodone) for pain, which provided some relief (R. 716, 720). Although Dr. Slodki noted that Ms. Trevino had additional trigger point and epidural injections and a medial branch block to try to resolve her shoulder, neck and back pain as late as February and March 2012, he nevertheless opined that after shoulder surgery, Ms. Trevino was left with only a "relatively minor mild C-spine problem" (R. 49-52).

Ms. Trevino also testified about her pain at the July 17, 2012 hearing, but the ALJ did not discuss her testimony in his opinion. Ms. Trevino testified that she has pain in her neck and shoulder that burns down her back, across her shoulder and down her arm, and she experiences

8

burning pain and numbness in her right hand, causing her to drop things (R. 57-58). The pain worsens if she sits for long periods of time, shooting down her spine to her mid-back, and she can only stand about 10 minutes before she needs a break due to pain (R. 61, 68). Ms. Trevino testified that her pain fluctuates, but she is never pain free; she described her back pain as ranging from zero to seven out of ten (R. 58, 67).

The ALJ concluded that due to medical improvement, as of October 14, 2011, Ms. Trevino had an RFC that allowed her to perform unskilled sedentary work limited to simple, routine and repetitive tasks and incidental contact with the public. He determined that with that RFC, Ms. Trevino could not perform her past relevant work, but could perform other jobs that the VE testified exist in significant numbers in the national economy (R. 21-22).

## II.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence, which [has been] described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although [this court] will not reweigh the evidence or substitute our own judgment for that of the ALJ, [this court] will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow [the] reviewing court[] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

### A.

Initially, we disagree with Ms. Trevino's argument that the ALJ was powerless to determine whether there was an end date to her period of disability. Ms. Trevino contends that

9

once a claimant is found disabled at Step 3 (having met a Listing), the ALJ may not "continue the inquiry" and ask whether the disability ended due to medical improvement (doc. # 17: Pl.'s Mem. at 5-6). She argues that by finding that her disability ended within the timeframe the disability application was before the ALJ, the ALJ performed a "continuing disability review" under 20 C.F.R. §§ 404.1589 and 404.1593, which requires that, after a claimant has been found disabled, the Commissioner notify the claimant when he or she is being evaluated for continuing entitlement to benefits (*Id.* at 7).

Contrary to Ms. Trevino's argument, "[i]f the ALJ finds the claimant to be disabled at any point in the process, she must determine whether the disability continues or ends." *Gehrke v. Colvin*, No. 12-3310, 2014 WL 5438525, at *5 (N.D. Ill. Sept. 22, 2014). The ALJ here did not perform a "continuing disability review" under 20 C.F.R. §§ 404.1589 or 404.1593, but instead, applied 20 C.F.R. § 404.1594 (R. 19-20).[16] Under Section 404.1594, the ALJ may limit a claimant's benefits to a closed period if the ALJ concludes that the claimant experienced "medical improvement" as evidenced by changes in the symptoms, signs or test results associated with her impairments. 20 C.F.R. § 404.1594. *See also Tumminaro v. Astrue*, 671 F.3d 629, 632-33 (7th Cir. 2011) (citing 20 C.F.R. § 404.1594(a), (b)(1)) (considering appeal from claimant whom the ALJ concluded was disabled for a fixed period of time until she "experienced medical improvement and [] engaged in substantial gainful activity and, therefore, [was] no longer disabled").

---

[16]The ALJ also cited to 20 C.F.R. § 416.994, which sets forth how the Social Security Administration will determine whether a claimant's disability continues or ends as part of their "periodic" review of a claimant's continued entitlement to benefits. However, like 20 C.F.R. §§ 404.1589 and 404.1593, this section does not apply here, where the issue is not the Administration's periodic determination -- made from "time to time" after a finding of disability -- as to whether the claimant is still eligible for disability benefits, but a single ALJ opinion addressing one timeframe for disability, during which the ALJ found the claimant's disability ended.

Thus, we have no quarrel with the ALJ's authority to make a determination as to whether Ms. Trevino's disability came to an end. However, as we explain below, we find fault with the ALJ's treatment of the record evidence in reaching his decision.

## B.

The ALJ found that Ms. Trevino's disability ended on October 14, 2011 due to medical improvement. Where an ALJ determines that a claimant's disability has ended due to medical improvement, the ALJ must follow the eight-step process set forth in 20 C.F.R. § 404.1594(f), asking whether the claimant: (1) is engaging in substantial gainful activity; (2) has an impairment or combination of impairments which meets or equals the severity of a listed impairment; (3) has experienced medical improvement, defined in §404.1594(b)(1) as any decrease in the medical severity of the claimant's impairments as shown by improvement in the symptoms, signs and/or laboratory findings associated with the impairments; (4) has experienced an increase in her RFC as a result of the medical improvement; (5) has, despite no medical improvement, the ability to engage in substantial gainful activity or has failed to follow prescribed treatment which could have restored that ability; (6) despite medical improvement, has current impairments in combination which are severe; (7) has the ability and RFC to do her past relevant work; and (8) has the ability to do other work constituting substantial gainful activity.

In analyzing whether a claimant is disabled, it is well-settled that "[t]he ALJ has a duty to fully develop the record before drawing any conclusions and must adequately articulate her analysis so that we can follow her reasoning." *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015). "An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th

Cir. 2014). For the reasons described below, shortcomings in the ALJ's analysis of Ms. Trevino's medical improvement require a remand.

## C.

The ALJ erred in applying Steps 3 and 4 of 20 C.F.R. § 404.1594(f), because he concluded that Ms. Trevino experienced medical improvement without adequately explaining how the symptoms, signs and/or laboratory findings showed a decrease in the medical severity of Ms. Trevino's shoulder and neck impairments. The ALJ provided almost no analysis of the evidence after October 13, 2011 to support his decision that as of October 14, 2011, Ms. Trevino's severe impairments had improved to the point that she no longer met Listing 1.02 and had an RFC that no longer rendered her disabled. Instead, the ALJ summarily stated that Ms. Trevino's shoulder problems were "successfully treated."

The ALJ's conclusion ignores evidence in the record suggesting that Ms. Trevino's shoulder problems continued well past October 14, 2011 (R. 20). The ALJ failed to acknowledge, much less address, most of the medical evidence of record from the physicians who treated Ms. Trevino after October 14, 2011. The ALJ cited to one doctor's visit on January 26, 2012, when Ms. Trevino had only mild tenderness in her shoulder and back and reported taking no pain medication (R. 21). However, as explained above, the ALJ did not mention that Ms. Trevino continued seeking treatment for her pain after that appointment. For example, on February 2, 2012, she received an epidural steroid injection from Dr. Tashima (R. 715), but her pain returned after two to three days (R. 716); on February 13, 2012, Dr. Rabinowitz prescribed a muscle relaxant and Norco for Ms. Trevino's neck and shoulder pain, which she rated as a seven out of ten (*Id.*); on March 30, 2012, Dr. Tashima performed three cervical medial branch blocks (R. 718); and on April 5, 2012, Ms. Trevino reported continued constant aching pain in her neck

12

and shoulder, with no benefit from the medial branch blocks (R. 720-21). Mentioning only one doctor's report that supports the ALJ's conclusion, while ignoring reports that undermine that conclusion, "is precisely the type of cherry-picking of the medical record that [the Seventh Circuit] ha[s] repeatedly forbidden." *Yurt*, 758 F.3d at 859.

Rather than discussing this evidence of Ms. Trevino's continuing pain, the ALJ "accept[ed]" the opinion of Dr. Slodki that Ms. Trevino could perform unskilled sedentary work as "consistent with the record" (R. 21). As we have explained above, however, there is record evidence the ALJ ignored that is at odds with Dr. Slodki's opinion. "The ALJ's conclusory statement that these findings were consistent with the record when in fact they are contradicted by it was not enough to justify elevating [Dr. Slodki's] opinion over all others." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). *See also Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ's "uncritical acceptance" of the conclusions of the non-examining physicians was error).

Moreover, the ALJ failed to explain how he picked October 14, 2011 -- one day after Ms. Trevino's shoulder surgery -- as the date she no longer was disabled. It strains credulity to suggest that Ms. Trevino no longer suffered from a severe shoulder impairment, and could perform at the RFC the ALJ gave her, only one day after undergoing shoulder surgery. As would be expected, Ms. Trevino continued to complain of right shoulder symptoms, swelling and tenderness at appointments on October 21, 2011 (R. 658) and November 18, 2011 (R. 659) -- and continued to be treated for pain in her neck and shoulder for months thereafter. Because the ALJ ignored evidence inconsistent with his finding that Ms. Trevino experienced medical improvement, the ALJ's determination must be reversed. *See Tumminaro*, 671 F.3d at 634-35.

13

**D.**

The ALJ also failed to sufficiently explain his findings regarding Ms. Trevino's mental health impairments. As with her physical impairments, the ALJ erred in ignoring evidence regarding the severity of Ms. Trevino's mental health impairments. *See Thomas*, 745 F.3d at 806.

The ALJ found that prior to October 14, 2011, Ms. Trevino suffered from a mood disorder and anxiety, two impairments in the list the ALJ introduced with the phrase, "one or more of which were severe" (R. 17). The ALJ acknowledged that Ms. Trevino began seeing a psychiatrist in 2010, but then erroneously stated that she last saw a psychiatrist in March 2012 "because of financial reasons" (R. 21). In addition, in his discussion of the evidence as of October 14, 2011, the ALJ stated that Ms. Trevino merely had "symptoms" of anxiety and depression (R. 21), suggesting -- without any explanation -- that Ms. Trevino's mental impairments were no longer severe.

The ALJ's conclusion failed to grapple with contrary evidence in the record. Ms. Trevino's mental health treatment did not end in March 2012, and in June and July 2012, DuPage County Psychological Services diagnosed Ms. Trevino with severe major depressive disorder and panic disorder and assessed her with a GAF score of 45, signifying serious psychiatric illness (*see supra* p. 6). In addition, in July 2012, Ms. Trevino went to the emergency room for anxiety and panic attacks (R. 724).

In the end, the ALJ again accepted the opinion of the medical expert who testified at the hearing on Ms. Trevino's mental impairments, Dr. Cremerius, as "consistent with the record" (R. 21), without adequately addressing the contrary evidence in the record. "The error here is the failure to address all of the evidence and explain the reasoning behind the decision to credit some evidence over the contrary evidence, such that we could understand the ALJ's logical bridge

14

between the evidence and the conclusion. By failing to even acknowledge that evidence, the ALJ deprived us of any means to assess the validity of the reasoning process." *Moore*, 743 F.3d at 1123.[17] This error requires reversal of the ALJ's determination.

### E.

Finally, we find that the ALJ's credibility analysis was flawed. "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses. Therefore, we will only overturn the ALJ's credibility determination if it is patently wrong, which means that the decision lacks any explanation or support." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014) (internal citations omitted).

Here, the ALJ relied on the oft-criticized boilerplate language that Ms. Trevino's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning October 14, 2011, to the extent they are inconsistent with the RFC" (R. 20). The Seventh Circuit has explained that "no matter how unhelpful the language is, simply because the ALJ 'used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if [he] otherwise points to information that justifies [his] credibility determination.'" *Murphy*, 759 F.3d at 816 (quoting *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013)). Conversely, "the ALJ's use of boilerplate language is reversible error if [he] did not give sufficient reasons, grounded in evidence in the record, to support [his] ultimate determination." *Murphy*, 759 F.3d at 816.

---

[17]It is unclear what import, if any, the ALJ gave to the fact that Ms. Trevino stopped seeing a psychiatrist for financial reasons. That said, stopping treatment for financial reasons does not alone establish that an impairment is not severe. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("Inability to pay for medication or negative side effects from medication may excuse failure to pursue treatment").

15

In explaining his credibility finding, the ALJ noted merely that a record dated January 26, 2012 stated that Ms. Trevino had generalized mild tenderness over her neck and shoulder and mildly restricted movement, and she was not taking medication for pain relief at that time (R. 21). This single medical record, however, is not sufficient to explain or support the ALJ's credibility determination. Not only did the ALJ ignore medical evidence to the contrary showing that Ms. Trevino continued to seek treatment for pain she claimed was severe after January 2012, but the ALJ failed to discuss any of plaintiff's testimony, including her testimony that she continues to have severe pain in her shoulder, neck and back that severely limits her functionality and some days keeps her in bed. If the ALJ disbelieved Ms. Trevino, he needed to evaluate her subjective reports of pain and functional limitations, along with the medical evidence, in order to build a logical bridge between the evidence and his conclusion. *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013). His failure to do so requires remand.

## CONCLUSION

For the reasons stated above, we grant Ms. Trevino's motion to remand (doc. # 16) and deny the Commissioner's motion to affirm (doc. # 24). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATE: June 3, 2015**